UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

WILLIAM RIOS PINERO,

               Plaintiff(s),

v.

UNITED STATES OF AMERICA,

               Defendant(s).

Civil No.  08-2402 (DRD)

**OPINION AND ORDER**

Pending before the Court are the following motions: (a) *Motion for Summary Judgment;* the *Memorandum of Law in Support of Defendant's Motion to Dismiss or for Summary Judgment*, and the *Motion Submitting Exhibits* filed by the defendant United States of America (hereinafter the "defendant" or the "Government"), Docket entries No. 75-77; (b) *Plaintiff's Opposition to Defendant's Motion for Summary Judgment*; *Plaintiff's Memorandum of Law in Support of Opposition to Defendant's Motion for Summary Judgment*; *Plaintiff's Corrected Statement of Relevant Facts*; *Plaintiff's Motion Submitting Exhibits to Motion in Opposition to Defendant's Motion for Summary Judgment*, Docket entries No. 84-86, 88; (c) *Reply to Plaintiff's Response to Defendant's Statement of Uncontested Facts* filed by the defendant; *Opposition to Plaintiff's Corrected Statement of Relevant Facts*, and *Defendant's Reply to Plaintiff's Opposition to Motion for Summary Judgment*, Docket entries No. 93-94, 101; (d) *Plaintiff's Sur-Reply to Defendant's Reply to Plaintiff's Response to Defendant's Statement of Uncontested Facts (Docket No. 93)*, Docket No. 106.  For the reasons set forth below, defendant's motion for summary judgment is GRANTED.

**Introduction**

The instant action stems from a claim filed by plaintiff William Ríos Piñeiro (hereinfter "Plaintiff" or "Ríos") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et seq.,* specifically under section 2680(h).[1]  Plaintiff is a former independent contractor also referred to as a supplier from the United States Postal Service ("USPS").  On August 17, 2006, plaintiff's contract was terminated amidst several incidents wherein Ríos was allegedly caught tampering with the mail. After three reported incidents, the contracting officer ultimately determined that plaintiff's contract "was terminated for failure to perform service under Section B [Contract HCR 00667], Statement of Work and Specifications Clause B.3 General Requirements and Prohibitions a. Sanctity of the Mail & c. Protection of the Mail and Handbook P-5 Section 312.1 Examining Mail." *See* Docket No. 77-8, Letter of termination dated August 17, 2006 addressed to plaintiff from Amelia de Jesús, Manager, Transportation Contracts/Contracting Officer (hereinafter "Termination Letter of

---

[1]

  28 U.S.C. § 2680(h), provides in its relevant part:

  The provisions of this chapter and section 1346(b) of this title shall not apply to –

  (h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract right: *Provided*, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution.  For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

August 17, 2006 ").

After exhausting the administrative remedies, Ríos filed the instant complaint.  The issues now pending before the Court are: (a) alleged malicious prosecution; (b) invasion of privacy; and (c) the damages to be determined based under Puerto Rico tort law, such as, economic loss.  *See Minutes* of January 19, 2012, Docket No. 133.

### Factual and Procedural Background

The instant action was filed on December 22, 2008.  The parties have stipulated the following uncontested facts, which the Court set forth below for easy reference:

1.    Plaintiff Ríos was a contract carrier for the U.S.P.S. during twenty-eight years.

2.    Amelia de Jesús was the Contracting Officer at all times relevant to this complaint.

3.    Dale Turner was supervisor at the Postal Inspector's Office.

4.    Lucydali Rivera, Vanessa Delgado, Angel Nieves, Iván Ramírez, Edwin Sanabria were postal inspectors.

5.    Mark Nieves was a postal mail carrier assigned to the Florida Post Office; site where Plaintiff Ríos worked.

6.    Mark Nieves began to work at the Florida Post Office in January 2006.

7.    Lucydali Rivera knew about the existence of personal conflicts between plaintiff Ríos and Mark Nieves before July 12, 2006 because Mark Nieves had told her.

8.    Before July 12, 2006 Mark Nieves called Lucydali Rivera several times stating he saw Plaintiff Ríos riffling and stealing mail.

9.    On the morning of July 12, 2006, Lucydali Rivera instructed Mark Nieves to place three marked envelopes containing greeting cards with currency at the Florida Post Office.

10.    At the time relevant to this complaint, there were no cameras in the work area of the Florida Post Office.

3

11.     Plaintiff left to deliver his route and returned to the post office around 2:30 p.m.

12.     At the post office, Ríos was approached by a postal inspector who asked him accompany [sic].

13.     Postal inspectors did not find any of the cards given to Nieves by the postal inspectors.

14.     Puerto Rico police agent Maldonado Soto, was assigned to postal inspector's task force.

15.     The court dismissed all criminal charges filed against Ríos for lack of probable cause.

16.     Armando Maldonado Soto was a Puerto Rico law enforcement officer who was a member of a Task Force with certain Postal Inspectors.

17.     Mark Nieves was a mail carrier for the Postal Service and a federal employee, while Plaintiff was a contract carrier for the Postal Service and their delivery routes were different.

18.     The Inspection Service did not place surveillance or other cameras in the work area of the Florida Post Office.

19.     Mark Nieves reported to Inspector Lucidaly Rivera that he could no longer see any of the three test envelopes.

20.     Postal Inspectors did not confront Plaintiff Ríos when he left to get breakfast.

21.     Plaintiff Ríos brought back breakfast back to the Post Office and later left the Post Office to deliver mail.

22.     Plaintiff returned to the Post Office later in the afternoon after delivering the mail.

23.     Inspectors found a $5 bill that had been placed in the test letters in Plaintiff's pocket.

24.     [sic]    [Postal Inspectors] conducted searches incident to Ríos' arrest.

25.     [sic] [Postal Inspectors searched Ríos in the bathroom].  Evidence was not obtained during the visit to the bathroom.

26.     [sic]    [Postal Inspectors] searches Plaintiff's car.

27.     Mark Nieves provided a written statement to the Inspection Service.

4

28.     Plaintiff was summoned by the [Puerto Rico] Police Officer to appear in the Puerto Rico Municipal Court.

*See Joint Statement of Uncontested Facts*, and *Plaintiff's Motion to Supplement "Joint Statement of Uncontested Facts*," Docket entries No. 130 and 134.

In addition, the Court incorporates herein the Findings of Fact and Decision set forth in the *Opinion of the Board* issued by the United States Postal Service Board of Contract Appeals (hereinafter "PSBCA"), on September 14, 2010, 10-2 BCA P 34545, PSBCA No. 5357, 2010 WL 3620211 (P.S.B.C.A.).  *See also* Docket No. 77-12.  Counsel informed the Court that the *Opinion of the Board* issued on September 14, 2010 was not appealed, hence, it is now final and unappealable.

FINDINGS OF FACT

1.     On May 31, 2004, Respondent renewed Appellant's contract number HCR 00667. Service under the contract was to begin on July 1, 2004, and continue until June 30, 2008, at an annual rate of $34,580.52 (Appeal File, Tab (AF) 1; Stip. 1). The contract required Appellant to sort mail provided by Respondent into carrier cases and to deliver it to customers along a route originating in the Florida Post Office in Florida, Puerto Rico.

2.     Appellant had performed the services required under the contract for 28 consecutive years under contractual arrangements with Respondent prior to the 2004 contract renewal (Tr. II, pp. 135, 136). [Fn.2: The hearing in this appeal took place over two days.  A separate transcript volume was prepared for each day. Transcript Volume I (Tr. I) refers to testimony taken on October 15, 2008, and Transcript Volume II (Tr. II) refers to testimony taken on October 17, 2008].

3.     Contract Clause 2.3.1 (m), Termination for Default (December 2003) (Modified), authorized Respondent to terminate the contract for default by Appellant (AF 1, p. 35).

4.     Contract Clause 2.3.1 (s)(8), incorporated by reference the Events of Default (January 1997) clause which provided that the contract could be terminated for default for reasons which included (1) "[t]he supplier's failure to perform service according to the terms of the contract", and (2) if the supplier "is not reliable, trustworthy, or of good character." (AF 1, p. 36).

5.      The contract required Appellant to "carry all mail tendered for transportation . . . with certainty, celerity, and security" and to "protect the mail from loss, depredation, or damage." (AF 1, pp. 11, 12, 36).

6.      In January 2006, Postal Service carrier M. Nieves (Mr. Nieves) began employment as a letter carrier in the Florida Post Office. The work stations in the post office for the contract mail carriers and the letter carriers employed by the Postal Service were within a few feet of each other. A total of five letter carriers and three other postal employees worked in the office. (Tr. I, pp. 25-29, 35; Appellant Exhibit (App. Exh.) 1).

7.      Until mid-May of 2006, Mr. Nieves and Appellant had a friendly working relationship. Mr. Nieves would often greet Appellant in the morning with a handshake (Tr. I, p. 79; Tr. II, p. 148). Thereafter, they had a falling out. On more than one occasion Appellant threatened to report to the postmaster what he considered to be misconduct by Mr. Nieves in the performance of his postal duties. On one occasion, Mr. Nieves confronted Appellant while he was delivering mail along his route and again in the post office parking lot, angrily yelling obscenities at Appellant, and the two men almost engaged in a fistfight. Thereafter, Mr. Nieves and Appellant stopped shaking hands at the beginning of the work day. (Tr. I, pp. 46-47, 79-80; Tr. II, pp. 151-155; Nieves 2nd Declaration, ¶ 3. Rios Declaration, ¶ 16). [Fn.3: There is conflicting testimony regarding whether Mr. Nieves subsequently shook Appellant's hand thereafter on July 12, 2006.  We find that Mr. Nieves did not shake Appellant's hand on that date].

8.      The "hotcase" at the Florida Post Office is a location in the carrier work area where missent [Fn.4: Letters are considered to be "missent" if they contain a delivery address that does not match an address of a delivery point along a letter carrier's delivery route (Tr. I, pp. 91, 92, 108)] letters are deposited. On or about June 19, 2006, Mr. Nieves reported to Postal Inspector Rivera that he had seen Appellant take mail from the hotcase and take money out of an envelope. On a number of occasions thereafter, he called to report what he claimed were other instances of Appellant stealing from the mail. [Fn.5: There is conflicting testimony from Mr. Nieves and Inspector Rivera as to how many times he called Inspector Rivera to alert her to activities of Appellant prior to July 12, 2006.  We find the differences to be immaterial and accept as sufficient for the purpose of this Opinion that Mr. Nieves made several calls to Inspector Rivera.  (Tr. I, pp. 17, 18, 34, 145, 146)].  In response to the telephone calls from Mr. Nieves, Inspector Rivera telephoned Mr. Nieves and asked that he continue to observe Appellant and contact her when he observed Appellant engage in more of the same type of behavior. (Tr. I, pp. 14-18, 35-37, 51, 145-46; Declaration of L. Rivera (Rivera Decl.), ¶ 2; App. Exh. 11; AF 2, p. 100).

6

9.      Acting on Mr. Nieves' reports, the Inspection Service decided to make test mailings in the Florida Post Office. Inspectors prepared three test envelopes, each of which contained postage on the exterior and a greeting card, United States currency, and fluorescent powder inside (Tr. I, p. 108; App. Exh. 1). A record was kept of the currency (including identifying marks that had been placed thereon by the inspectors, and serial numbers) and cards contained inside each envelope (Tr. II, pp. 6, 7). Inspector Rivera and some of the other inspectors also inserted the fluorescent powder into each of the three envelopes. [Fn.6: Fluorescent powder, while normally undetectable by the naked eye, becomes visible when exposed to ultraviolet light (Tr. I, p. 109)].  After sealing the contents inside, they checked the outside of each envelope with ultraviolet light to insure that there was no fluorescent powder on the outside of the envelopes (Tr. I, p. 113; Tr. II, pp. 7, 8). They also tested each envelope to insure that it would remain sealed during the course of normal postal processing (Tr. II, p. 8). The amount of fluorescent powder placed in each envelope was sufficient to cause powder to be transferred to the person unsealing and opening the envelope. (Tr. I, p. 109).

10.      The envelopes contained destination and return addresses in the state of Florida rather than in the town of Florida, Puerto Rico, so they could not be properly delivered to addresses served out of the Florida Post Office and should have been considered missent mail. If properly handled, they ultimately would have been delivered to either the destination or return address. (Tr. I, p. 108).

11.      Pursuant to her telephonic request the previous day, on July 12, 2006, Mr. Nieves met Inspector Rivera and five other inspectors at a shopping mall near the town of Florida at 6:00 a.m. Mr. Nieves had not been told the purpose of the meeting in advance of his arrival. During the meeting Inspector Rivera advised that she wanted him to place the three test envelopes in and around the areas of the Florida Post Office from which he had previously reported seeing Appellant take missent mail. The inspectors decided not to place the envelopes in the Florida Post Office themselves because the facility was very small and they thought their investigation might be compromised if employees noticed unfamiliar people in the facility. Mr. Nieves was instructed to call Inspector Rivera as soon as he had placed the envelopes. Mr. Nieves was not advised of the contents of the envelopes. (Tr. I, pp. 31, 109-11).

12.      Mr. Nieves departed the shopping mall in his vehicle and drove directly to the Florida Post Office where he arrived at approximately 7:00 a.m. The inspectors followed him in separate vehicles to the Florida Post Office and waited outside. (Tr. I, p. 111).

13.     Upon arriving at the Florida Post Office, Mr. Nieves placed two of the prepared envelopes at the hotcase and one envelope at Appellant's workstation. Mr. Nieves telephoned Inspector Rivera as instructed to let her know that he had placed the prepared envelopes. Mr. Nieves telephoned Inspector Rivera at least two more times before Appellant left the post office to deliver his route to advise her that the prepared envelopes were not in the locations in which Mr. Nieves had placed them. Mr. Nieves also advised that Appellant, after having collected money from several of his coworkers, was leaving to buy them breakfast.  (Tr. I, pp. 20, 22, 23, 111-13).  [Fn.7: On almost a daily basis Appellant would collect money from some of this coworkers and travel to a nearby supermarket to buy breakfast for all of those who had contributed.  When he returned to the post office, Appellant and his coworkers would gather in the breakroom and eat the breakfast Appellant has purchased.  Mr. Nieves participated in the practice of contributing money to Appellant for breakfast until his relationship with Appellant soured in mid-May of 2006. (Tr. I, pp. 75, 76, 81; Nieves 2nd Declaration, ¶¶ 4, 5).  We do not find that Mr. Nieves contributed money to the "breakfast fund" on the morning of July 12, 2006].

14.     As a result of Mr. Nieves' telephone calls to Inspector Rivera, the postal inspectors assumed that Appellant had taken the prepared envelopes (Tr. I, p. 158). The inspectors did not confront Appellant prior to him completing his mail delivery because they wanted to give him the opportunity to perform his post-delivery sorting of mail and to return the prepared envelopes to the post office in the event he had taken them by mistake (Tr. I, p. 114).

15.     After Appellant returned to the post office from delivering his route shortly after 2 p.m., he was permitted to finish his post-delivery tasks and then directed by one of the inspectors to come to the postmaster's office. There were several inspectors inside the postmaster's office. Once inside, **Appellant complied with Inspector Rivera's request that he empty his pockets. Appellant removed four $20 bills, eleven $1 bills, and one $5 bill from his pocket, which were then placed on a table by the inspectors. The serial numbers on the currency taken from Appellant were compared to the serial numbers on the currency inserted into the test envelopes. The serial number of the $5 bill taken from Appellant matched the serial number and bore the inspector's mark of one of the $5 bills that was placed in one of the test envelopes. The inspectors kept the $5 bill and returned the other currency to Appellant. None of the three test envelopes was delivered as addressed or returned to the listed return address. Further, none of the three test envelopes or their contents, aside from the marked $5 bill found in Appellant's possession, was ever found at any other location**. (Tr. I, p. 115; Tr. II, pp. 162-65, 213; App. Exh. 6; Rivera Decl., ¶ 16).  (Emphasis ours).

16.    **Shortly thereafter, Appellant accompanied two male inspectors to a janitorial closet for additional screening with an ultraviolet light. The inspectors chose this room because it was dark once the door was closed, and fluorescent powder shows up better under ultraviolet light in a darkened room. Once inside the closet the two inspectors examined Appellant with the ultraviolet light and discovered fluorescent powder on both of Appellant's palms and the front pocket area of his pants. The amount of powder discovered on Appellant indicated that he was the person who opened at least one of the prepared envelopes**. (Tr. I, pp. 116, 117; Tr. II, pp. 12, 13, 210).  (Emphasis ours).

17.    Appellant could only have had the amount of fluorescent powder discovered on his person if he had opened one of the prepared envelopes. If someone had handed Appellant a single bill of currency that had been contaminated with fluorescent powder, it would have left only a trace amount of powder on his person as opposed to the larger amount that was actually present. (Tr. I, p. 117; Tr. II, pp. 12, 13).

18.    Shortly after the discovery of the fluorescent powder on Appellant, he was directed by the Florida Postmaster to leave the facility (Tr. II, p. 174).

19.    By cover memorandum dated July 13, 2006, Inspector Rivera forwarded to the contracting officer an Investigative Memorandum (IM) dated July 13, 2006. The IM generally described the events of July 12, 2006, involving Appellant and specifically included a statement that a $5 bill contained in one of the test envelopes was found in Appellant's possession. (AF 5).

20.    By letter dated July 19, 2006, the contracting officer terminated Appellant's contract for default effective July 12, 2006. The letter stated, among other things, that Appellant's contract was being terminated because he was found to have in his possession a $5 bill that had been placed in one of the prepared envelopes that the postal inspectors caused to be placed in the Florida Post Office. (AF 3).

21.    By letter to the contracting officer dated August 7, 2006, Appellant timely appealed the contracting officer's final decision (AF 4).

22.    In 2003, Appellant had been accused of stealing gift cards worth $300 from the mail. Two $150 Sears gift cards were lost from an envelope mailed to a post office box in the Florida Post Office. Appellant used the gift cards to buy merchandise at Sears, but claimed that an acquaintance found them in the lobby of the post office and gave them to him. A local judge dismissed

9

related theft charges for lack of evidence. At the contracting officer's
insistence (the same contracting officer who terminated Appellant's contract
at issue here), Appellant reimbursed the rightful owner for the cost of the
cards. Over the strong objections of the investigating postal inspectors, the
contracting officer decided not to terminate Appellant's contract and allowed
him to resume performance after a suspension imposed while the criminal
proceedings were pending. (AF 2, pp. 93-95; App. Exh. 5).

*The Incidents of the Year 2003*

The first two incidents involving Ríos occurred in the year 2003, specifically on
September 24, 2003 and November 4, 2003. *See* Docket No. 77-9. After an investigation was
conducted on the two charges, one for theft of mail, and the other for appropriation of stolen goods,
wherein in both cases the judges dismissed the claims for lack of evidence. Based on these premises,
the Contracting Officer Amelia de Jesús (hereinafter the "Contracting Officer" or "CO de Jesús")
made the decision to give the plaintiff a second chance, as opposed to terminate the contract based
on the record that the judges had found no evidence to support the theft and appropriation charges.
*See* Docket No. 77-9. The record shows that, although the contracting officer met with
Inspector Tanner and INC Manuel González, the CO de Jesus refused to terminate plaintiff's
contract at that time. The record shows:

On Friday, November 7th, I met with Inspector Tanner and
the INC Manuel González. He explained his position and allowed me
to explain mine. He understands that the PI service could have done
things differently which could have brought forth different results.
Although he wished that I would have taken a different approach, he
finally reasoned and understood my position and reasoning.

He finally stated, that looking at the picture from where he was
sitting, he understood that I was doing a good job. He further stated
that he is still learning the ropes (new to the Caribbean and to these
inspectors) and was hoping that everyone learns to do things better
and differently.

10

> We shook hands, as he left, he requested that we close the case but
> that it should reflect that supplier did not get away with it 100%.  To
> put an end to it, I stated that I would be taking the money out of the
> suppliers pay, the desgrace [sic] and public humiliation passed was
> punishment enough especially with the presumption of innocence on
> him.   Amelia

*See* Docket No. 77-9, pages 2-3.  The record shows that plaintiff's contract was renewed on May 31,

2004.  *See* Docket entries No. 77-9 and 141-1.

### *The Incident of the Year 2006*

The third incident occurred on July 12, 2006, when the Postal Inspectors decided to conduct

an investigation which was triggered by information received by one of plaintiff's co-workers,

Mark Nieves, Letter Carrier.  *See* Docket No. 77-9, page 10, the Investigative Memorandum dated

July 13, 2006, Case No. 0749-1599878-MTL-(1), Florida, PR: Investigation fo the conduct of

Willam A. Ríos-Piñero, Highway Contractor (hereinafter the "Investigative Memorandum of July 13,

2006"), which is signed by Lucydali Rivera, U.S. Postal Inspector (hereinafter "PI Rivera").

When informed about this last claim, PI Rivera prepared three (3) envelopes with cash inside.

The bills placed inside each envelope were marked with a blue florescent powder, and their serial

numbers were also marked.  While the blue florescent powder was not clearly visible to the naked

eye, it can easily be detected in the dark with an ultraviolet light.  One envelope was placed in Ríos'

case, and two (2) envelopes were placed in the "hot box."  *See* Docket No. 77-9, page 10, the

Investigative Memorandum of July 13, 2006.  Upon Ríos' return from his delivery route, the Postal

Inspectors were waiting for him, and asked the plaintiff several questions regarding the envelopes.

*See* Findings of Fact No. 15 and 16.  Plaintiff further alleges that thereafter he was taken by two male

inspectors to the bathroom, who asked Ríos to take off his shoes, his socks, his belt, and to pull down

11

his pants.  *See* Docket No. 88-1, pages13-16, Plaintiff's deposition taken by the defendant, on July 29, 2010,[2] and filed as an exhibit of *Plaintiff's Motion Submitting Exhibits to Motion in Opposition to Defendant's Motion for Summary Judgment.*   The record shows that plaintiff was asked whether he agreed to pull down his pants, and Ríos answered in the affirmative.  *See* Docket No. 88-1, page 16.  Thereafter, the inspectors pulled out the elastic band of plaintiff's underpants without informing plaintiff that they intended to pull said elastic band.  *See* Docket No. 88-1, page 16.  Nothing happened after that, except that plaintiff was told to pull up his pants and put his shoes on.  *See* Docket No. 88-1, page 16.   The record shows that plaintiff agreed to what they [the inspectors] did.  *See* Docket No. 88-1, page 16.   The record further shows that plaintiff was asked whether there was any touching of plaintiff's private parts when the inspectors pulled out the elastic band of his underpants.  *See* Docket No. 88-1, page 16. Plaintiff answered "no, no, no." *See* Docket No. 88-1, page 16. [3]

---

[2]      The Court notes that: (a) only excerpts of the plaintiff's deposition were included with *Plaintiff's Motion Submitting Exhibits to Motion in Opposition to Defendant's Motion for Summary Judgment*; and (b) the excerpts of plaintiff's deposition were submitted in Spanish.

[3]      For easy reference, the Court incorporates part of plaintiff's testimony in Spanish, *see* Docket No. 88-1, page 16:

> P.      Okey.  Porque así le pidieron que se bajara los pantalones y usted se los bajo?  Dijo que sí con la cabeza.
>
> R.      Sí, señora.
>
>   . . .
>
> P.      Okey.  Y entonces qué pasó?
>
> R.      Pues no pasó nada.  Ellos soltaron eso y me dijo después, "Pongase los zapatos y subase el pantalón."
>
> P.      Okey.
>
> R.      **Y accedí hacer lo que hicieron.**

Due to the fact that plaintiff's testimony is determinative to rule on the pending motion for summary judgment, the Court *sua sponte* translated part of the testimony.  Defendant is granted 48 hours from the entry of this order to provide an official translation of the excerpts of plaintiff's testimony, in compliance with Local Rule 5(g) of the United States District Court for the District of Puerto Rico.  "All documents not in the English language which are presented or filed, whether at evidence or otherwise, must be accompanied by a certified translation into English prepared by an interpreter certified by the Administrative Office of the United States Courts.  Certification by a federally-certified interpreter may be viewed upon stipulation by all parties."  *See Rodríguez v. Municipality of San Juan*, 659 F.3d 168, 174-175 (1st Cir.2011); *see also In re Alvarado*, ___ B.R. ___, 2011 WL 4527329 (D.P.R. (September 30, 2011)).

The Investigative Memorandum of July 13, 2006, further states:

> 6.  At approximately 9:30 AM I observed Ríos leaving the post office to deliver his route.  At approximately 2:20 PM Ríos returned from his route.

> 7.  Ríos was taken to the Post Master's office in the Florida Post Office.  Part of the contents of greeting card number two (2), a five (5) dollar bill was recovered from Ríos' right front pocket.  Ríos was advised of his Miranda Rights and signed form 1067-S Warning and Waiver of Rights (Exhibit 4).  Ríos exercised his right to an attorney and the interview was terminated.

*See* Docket No. 77-9, page 11, the Investigative Memorandum of July 13, 2006.

*Termination of Contract HCR 00667*

On August 17, 2006, plaintiff's contract was terminated by the CO de Jesús under the default

---

| P. | **Yo tengo que hacer esa pregunta, en algún momento ellos metieron la mano o tocaron, hicieron ...** |
|----|------|
| R. | **No, no, no**.   (Emphasis supplied). |

clause for "failure to perform service under Section B, Statement of Work and Specifications Clause B.3 General Requirements and Prohibitions a. Sanctity of the Mail & c. Protection of the Mail and Handbook P-5 Section 312.1 Examining Mail." *See* Docket No. 77-8, Termination Letter dated August 17, 2006. Plaintiff filed an appeal before the PSBCA. *See* Docket No. 77-9. As stated above, the PSBCA entered an *Opinion and Order* on September 14, 2010, wherein findings of fact number 15 and 16, clearly show that plaintiff was literally found "with his hands in the cookie jar." The *Opinion of the Board* is now final and unappealable.

## Applicable Law and Discussion

### *The Summary Judgment Standard*

Generally, "[s]ummary judgment is proper where 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c)." *Richardson v. Friendly Ice Cream Corporation*, 594 F.3d 69, 74 (1st Cir. 2010). See also *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-325 (1986); *Thompson v. Coca-Cola, Inc.*, 522 F.3d 168, 175 (1st Cir. 2008). "The object of summary judgment is 'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required'." *Dávila v. Corporación de Puerto Rico para la Difusión Pública*, 498 F.3d 9, 12 (1st Cir. 2007), citing from *Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 7 (1st Circ. 2004),(quoting *Wynne v. Tufts Univ. Sch. Of Med.*, 976 F.2d 791, 794 (1st Cir. 1992). In *Dávila*, the Court held:

> For this purpose, an issue is genuine if a reasonable jury could resolve the point in favor of the nonmoving party. *Suárez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000). By like token, a fact is material if it has the potential to determine the outcome of the litigation. See *Calvi v. Knox Country*, 470 F.3d 422, 426 (1st Cir. 2006). Where, as here, the nonmovant has the burden of proof and the evidence on

14

one or more of the critical issues in the case "is … not significantly probative, summary judgment may be granted." *Acosta*, 386 F.3d at 8 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250 (1986)).

At the summary judgment stage, the Court "must scrutinize the evidence in the light most agreeable to the nonmoving party, giving that party the benefit of any and all reasonable inferences". *Noviello v. City of Boston*, 398 F. 3d 76, 84 (1st Cir. 2005), citing *Cox v. Hainey*, 391 F. 3d 25, 27 (1st Cir. 2004).  See also *Richardson*, 594 F.3d at 74.  "[T]he nonmovant bears 'the burden of producing specific facts sufficient to defect the swing of the summary judgment scythe.'" *Noviello*, 398 F.3d at 9.  "Those facts, typically set forth in affidavits, depositions, and the like, must have evidentiary value; as a rule, '[e]vidence that is inadmissible at trial, such as, inadmissible hearsay, may not be considered on summary judgment." *Id.* at 84, citing *Vázquez v. López-Rosario*, 134 F.3d 28, 33 (1st Cir. 1998); accord *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990).  "The evidence presented by the non-moving party may not be 'conclusory allegations, improbable inferences, [or] unsupported speculation.'" *Torres-Negrón v. Merck & Company, Inc.*, 488 F.3d 34, 39, citing *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

Moreover, "[a] fact is material if it might 'affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)."  "Disputes over facts that are not outcome determinative will not preclude the entry of summary judgment."  *Id.  See Emiabata d/b/a Nova Express v. The United States*, 90 Fed.Cl. 22, 27 (October 30, 2009).

In *Sanchez v. United States*, ___ F.3d ___, 2012 WL 447164, *9 (1st Cir. (P.R.) (February 14, 2012)), the Court held:

> The plaintiffs argue that their allegations are sufficient to raise disputed facts derived from pleadings, depositions, answers to interrogatories, admissions and affidavits."  *Magee v. United States*, 121 F.3d 1, 2 (1st Cir.1997)."  "As

15

we have held, "[i]t is a long standing principle of this Circuit that bald assertions and unsupportable conclusions are not enough to create a genuine issue of material fact. *Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de P.R.*, 394 F.3d 40, 44 (1st Cir. 2005).

In the instant case, the Court finds that from the pleadings; depositions; the parties' joint stipulated facts, as well as the findings of fact made by the PSBCA, plaintiff's alleged contradictions in Nieves' testimonies, and plaintiff's "bald assertions and unsupportable conclusions are not enough to create a genuine issue of material fact" that may warrant a bench trial. *See Sanchez v. United States*, *supra*. "Disputes over facts that are not outcome determinative will not preclude the entry of summary judgment." *Id. See Emiabata d/b/a Nova Express v. The United States*, 90 Fed.Cl. 22, 27 (2009). *See also Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 332 (1st Cir. 2005). In *Colburn*, *supra*, the Court held:

> Colburn argues that the affidavit should not have been stricken because it was not creating a "sham fact issue." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986). But the applicable standard in this circuit is not whether a sham issue of fact has been created. Our law is clear that "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory" without providing "a satisfactory explanation of why the testimony is changed." *Colantuoni v. Alfred Calcagni & sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2726, at 30-31 (2d ed. Supp.1994)).

*See also Morales v. A.C. Orssleff's EFTF*, 246 F.3d 32, 35 (1st Cir. 2001) ("We have refused to allow issues of fact to be created simply by submitting a subsequent contradictory affidavit"); *Abreu-Guzmán, et al. v. Ford, et al.*, 241 F.3d 69, 74 (1st Cir. 2001) ("We have repeatedly held that a party opposing summary judgment may not manufacture a dispute of fact by contradicting his earlier sworn testimony without a satisfactory explanation of why the testimony was changed").

16

**Decision of the PSBCA is Res Judicata**

In *Emiabata*, 90 Fed.Cl. at 29, the Court held:

> Similar to the doctrine of collateral estoppel, the doctrine of res judicata determines whether a claim arising out of the same operative facts is precluded from being litigated in a subsequent court.  The Court of Appeals for the Federal Circuit defines res judicata as "constitut[ing] ... two preclusion concepts: 'issue preclusion' and 'claim preclusion.'" *Carson v. Department of Energy*, 398 F.3d 1369, 1375 (Fed.Cir.2005).  In describing the difference between issue preclusion and claim preclusion, the Federal Circuit explains:

>> Issue preclusion refers to the effect of judgment in foreclosing relitigation of a matter that has been litigated and decided.  This effect is also referred to as direct or collateral estoppel.  Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit.

> *Sharp Kabushiki Kaisha v. Thinksharp, Inc.*, 448 F.3d1368, 1370 (Fed.Cir.2006) (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77 (1984).  Further, the United States Court of Federal Claims has recognized the decisions of a Board of Contract Appeals to preclude, by res judicata, the litigation of claims that should have been litigated before the Board of Contract Appeals.  *See, e.g., Zoeller v. United States*, 65 Fed.Cl. 449, 457 (2005); *Ingalls Shipbuilding, Inc. v. United States*, 21 Cl.Ct. 117, 122-25 (1990).

> In analyzing the claim preclusion aspect of res judicata, "there must be (1) an identity of the parties  involved or their privies, (2) a final judgment on the merits of the prior claim, and (3) the second claim must be based on the same transactional facts as the first and should have been litigated in the prior case.  *Sharp Kabushiki Kaisha*, 448 F.3d at 1370.

In the instant case, the Court finds that the *Opinion of the Board* issued on September 14, 2010, is final and unappealable, as counsel informed the Court that said *Opinion* was never appealed to the United States Court of Federal Claims.  Hence, the *Opinion of the Board* of September 14, 2010 is res judicata for purposes of the instant complaint, as the action decided by the PSBCA comprises (1) "an identity of the parties involved or their privies;" (2) "a final judgment on the

17

merits of the prior claim;" and (3) "the second claim must be based on the same transactional facts as the first and should have been litigated in the prior case." *See Emiabata*, 90 Fed.Cl. at 29.  *See also Allen v. McCurry*, 449 U.S.90, 94-95 (1980); *In re Colonial Mortgage*, 324 F.3d 12 (1st Cir.2003); *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n.*, 142 F.3d 26, 37 (1st Cir.1998); *González v. Banco Central Corp.*, 27 F.3d 751, 755 (1st Cir.1994).

Should plaintiff had disagreed with the *Opinion of the Board* rendered on September 14, 2010, plaintiff made the wrong procedural decision by not taking an appeal from said *Opinion of the Board* issued by the PSBCA.  Instead, plaintiff decided to file the instant petition before this Court in an attempt to achieve a new bite to the apple before another forum.  The Court disagrees with plaintiff's litigation strategy, aside from being a waste of judicial resources, and most likely plaintiff's.  By filing the instant complaint in the federal district court, may have appeared as a good idea only to become frustrated by the doctrine of res judicata, which bars relitigation of "facts and issues" previously decided between the parties.  *Allen v. McMurray*, 449 U.S. at 94-95.  Plaintiff's own failure to take an appeal before the United States Court of Federal Claims, which is the proper forum to pursue this action, puts to rest any opportunity of success to plaintiff's claims.  The fact that plaintiff was found with the $5.00 bill placed previously in one of the envelopes, and that blue florescent powder was present in both of plaintiff's palms, as well as in the front pockets of plaintiff's pants with the same blue florescent powder that was placed on the test envelopes, absolutely dooms all of plaintiff's causes of actions.

### *Termination of the Contract HCR 00667: abuse of discretion?*

It is uncontested that plaintiff was under contract with the USPS for several years, and the last time plaintiff's Contract HCR 00667 (hereinafter the "Contract") was renewed was on May 31,

2004.  *See* Docket No. 141-1, page 2, *Motion Supplementing Exhibit*.  The Contract also provides

that plaintiff's new salary remains the same as the old salary, which is "$34,580.52 per annum."

 The Contract further provides certain clauses which are critical when considering whether

the contracting officer's termination of plaintiff's contract exceeded the discretionary boundaries.

Section 2.2 Special Clauses, provides several definitions under Section 2.2.1, such as, contracting

officer; contracting officer's representative; postal service; supplier, etc.  Section 2.2.2 governs the

"Appeals to Next Higher Contracting Authority."  Contracting Officer is defined as: "The person

executing this contract on behalf of the Postal Service, and any other officer or employee who is

properly designated Contracting Officer; the term includes, except as otherwise provided in the

contract, the authorized representative of a Contracting Officer acting within the limits of the

authority conferred upon that person."  *See* Docket No. 141-1, page 26.

 Section 2.2.2 c., provides: "The decision of the Contracting Officer or the decision on appeal

by the next higher level of contracting authority to terminate the contract for convenience or not to

renew the contract is **not a dispute under the Claims and Disputes clause**.  (Emphasis ours).  *See*

Docket No. 141-1, page 27.

 Section 2.3 General Clauses, governs the terms and conditions of the contract.

Section 2.3.m., provides the "Termination by Default:"

> The Postal Service may terminate this contract, or any part hereof, for
> default by the supplier, or if the supplier fails to provide the Postal
> Service, upon request, with adequate assurances of future
> performance.  **In the event for termination by default, the Postal
> Service will not be liable to the supplier for any amount for
> supplies or services not accepted, and the supplier will be liable
> to the Postal Service for any and all rights and remedies provided
> by law.**  The debarment, suspension, or ineligibility of the supplier,
> its partners, officers, or principal owners under the Postal Service's

procedures (see United States Postal Service Purchasing Manual 3.7) may constitute an act of default under this contract, and such act will not be subject to notice and cure pursuant to any termination of default provision of this contract.  **If it is determined that the Postal Service improperly terminated this contract by default, such termination will be deemed a termination for convenience**. (Emphasis ours).

*See* Docket No. 141-1, page 34.

Section 2.3.3 governs the "Termination for Convenience:"

**The Postal Service reserves the right to terminate this contract, or any part hereof, for its sole convenience.  In the event of such termination, the supplier must immediately stop all work and must immediately cause any and all of its suppliers and subcontractors to cease work**.  Subject to the terms of this contract, the supplier will be paid a percentage of the work performed prior to the notice of termination, plus reasonable charges the supplier can demonstrate to the satisfaction of the Postal Service using its standard record keeping system, have resulted from the termination.  The supplier will not be required to comply with the cost accounting standards and principles for this purpose.  . . .  (Emphasis ours).

*See* Docket No. 141-1, pages 36-37.

In the instant case, the plaintiff was terminated by default for failure to comply with Section B-3 of the contract named "General Requirements and Prohibitions," specifically subsection a. "Sanctity of the Mail," and subsection c. "Protection of the Mail."  *See* Docket No. 141-1, pages 10-11.  Pursuant to the terms of the Contract, the person authorized to make determination regarding the supplier's contract was the Contracting Officer or his/her representative "acting within the limits of the authority conferred to that person."  In sum, the Contracting Officer's determination shall be comprised within his/her discretion provided said determination is not out-of-bounds.

In *Sánchez v. United States*, ___ F.3d ___, 2012 WL 447164, *9 (1st Cir. (Puerto Rico) (February 14, 2012)), the Court held:

20

> A court inquiring into whether an FTCA claim falls within the discretionary function exception must first "identify the conduct that allegedly caused the harm." *Muñiz-Rivera v. United States*, 326 F.3d 8, 15 (1st Cir. 2003); *see also Irving v. United States*, 162 F.3d 154, 162 (1st Cir. 1998) (en banc). **This inquiry is a factual one**. . . . . (Emphasis ours).

A review of plaintiff's averments of the complaint, as well as plaintiff's arguments in his opposition to the defendant's motion for summary judgment are silent, and without any explanation as to whether or not plaintiff indeed breached the terms and conditions of the Contract, particularly whether plaintiff breached the sanctity of the mail and/or the protection of the mail clauses. Instead, plaintiff vehemently insists that his contract was terminated simply because his co-workers and supervisors fabricated a case against him. The Court is not persuaded by plaintiff's arguments, as the decision of the PSBCA constitutes res judicata, as to his severe breach of contract.

Plaintiff's otherwise arguments as to the termination of the Contract constitute simply bold and general conclusory allegations, which are naked of any legal analysis. At least, a careful review of the record before the Court at this stage of the proceedings is devoid of any legal grounds that may assist the Court in finding that the Contracting Officer had no grounds to terminate plaintiff's Contract by default, as indeed plaintiff never had breached the clauses of sanctity of the mail and/or protection of the mail.

Plaintiff has been working with the USPS service well over twenty-years, and his Contract has been renewed several times during plaintiff's years of service. Hence, plaintiff was cognizant at all times, that failure to comply with the terms and conditions of the Contract will entail the termination of the contract by default. The Contracting Officer is the authorized person to make that determination. Any disputes arising under the termination of the contract shall be entertained by the

PSBCA which is the forum that has jurisdiction to entertain this type of claims. *See Emiabata*, 90 Fed.Cl. at 29. Furthermore, the claim for termination of contract shall be entertained with any other related claim or claims that stemmed from said termination. *Id.* Hence, plaintiff is now precluded to seek economic loss for damages stemming from the termination of his Contract, as the *Opinion of the Board* of September 14, 2010 is now final, unappealable, and, hence, res judicata.

The fact remains that plaintiff could not show to the PSBCA nor to this Court, that he did have on his possession a $5.00 bill previously marked inside an envelope tester. The Contracting Officer was not persuaded by plaintiff's arguments nor was the PSBCA. Hence, this Court adopts the analysis and conclusion reached by the PSBCA:

> **It is well settled that a contracting officer may rely on investigative memoranda prepared by the Postal Inspection Service in deciding whether to terminate a contractor for default**. *Nuclear Research Corp. v. United States*, 814 F.2d 647, 649-50 (Fed. Cir. 1987); *Pacific Architects and Engineers, Inc. v. United States*, 491 F.2d 734, 744 (Ct. Cl. 1974); *Charli Selsa Schiver d/b/a NGX-Schiver*, PSBCA No. 4545, 02-2 BCA ¶ 31,937; *Stephen Zucker, Packages Services Plus*, PSBCA Nos. 3396, 3397, 3398, 96-2 BCA ¶ 28,282.

> **Finally, Appellant offered no evidence to support his argument that the contracting officer terminated his contract to placate the postal inspectors after her refusal to terminate the contract after Appellant's 2003 improper use of gift cards (Finding 22) and we reject it as speculative**.

> Therefore, **Appellant has not shown that the contracting officer abused her discretion in terminating the contract for default**.

> The appeal is denied. (Emphasis ours).

### Invasion of Privacy

Plaintiff alleges that the Postal Inspectors invaded his privacy when he was physically or bodily searched. The factors to be considered when determining whether a body search is warranted

are: (a) whether there is a suspicion that an individual may have committed an illegal act; (b) whether the officers or inspectors have probable cause to bodily search and individual without a warrant, such as a border search; (c) whether there is a causal nexus between the individual's conduct and the body search. *See generally*, *United States v. Cruz Jiménez*, 894 F.2d 1, 5-6 (1ˢᵗ Cir. 1990); *United States v. Guzmán*, 282 F.3d 56 (1ˢᵗ Cir. 2002); *United States v. Vázquez*, 857 F.2d 857 (1ˢᵗ Cir. 1988); *United States v. Kallevig*, 534 F.2d 411 (1ˢᵗ Cir. 1976); *United States v. Stornini*, 443 F.2d 833 (1ˢᵗ Cir. 1971).

The Court disagrees with plaintiff's claim, and briefly explains. It is well settled that for a body search to be considered as illegal, the victim must have exercised his rights at the time of the search, and oppose the search. The record in the instant case is clear that the plaintiff was aware that a body search of his person was being conducted, and he not only failed to object to the search, but agreed or consented to be searched, and even cooperate with the instructions that were given to him at the time. *See* Docket No. 88-1, page 16, and the discussion *infra* at page 12. The Court is in no way diminishing or underestimating plaintiff's feelings, however, the Court is forced to find that the test to determine whether or not there was an invasion of privacy that may entail a damages award is simply not met, as plaintiff consented to his body search on July 12, 2006. *See* Docket No. 88-1, page 16.

"A consent validly given, will, of course overcome the fourth amendment's presumptive prohibition against warrantless searches." *Cruz Jiménez*, 894 F.2d at 7. The Court is cognizant that plaintiff has not claimed a violation under the Fourth Amendment, however, once the individual voluntarily consents to the search, there is no Fourth Amendment violation.

23

### *Malicious Prosecution*

Plaintiff's main allegation is that he is the victim of a fabricated case and malicious prosecution.  The Court disagrees and briefly explains.

It is settled that when claiming malicious prosecution in a FTCA, the Court will look to the applicable law of the State where the alleged claim occurred.  In the instant case, the Court examines the applicable Puerto Rico law.  In *Barros-Villahermosa v. United States*, 642 F.3d 56, 58 (1ˢᵗ Cir. 2011), the Court held:

> To succeed on a claim for malicious prosecution in Puerto Rico, the claimant must prove four elements: "(1) that a criminal action was initiated or instigated by the defendants; (2) that the criminal action terminated in favor of plaintiff; (3) that defendants acted with malice and without probable cause; and (4) that plaintiff suffered damages." *Id.* (Internal brackets omitted).  Failure to prove any element is dispositive. *See id.* [*González Rucci v. U.S. Immigration & Naturalization Service*, 405 F.3d 45, 49 (1ˢᵗ Cir. 2005) (quoting *Rodríguez v. United States*, 54 F.3d 41, 44 (1ˢᵗ Cir. 1995)].

*See also González-Rucci v. United States Immigration and Naturalization Service*, 539 F.3d 66 (1ˢᵗ Cir. 2008).

In the instant case, the record is devoid of evidence that shows that the defendants acted with malice and without probable cause, as the marked $5.00 bill with an identified serail number was found in plaintiff's possession, and he also had in his hands and in one of his pants' pockets the same blue florescent powder that was placed in the envelope tester.  Hence, the Court finds that the malicious prosecution test is not met, as plaintiff failed to meet the four prong test.  "Failure to prove any element is dispositive."*Barros-Villahermosa v. United States*, 642 F.3d at 58.

### *Mark Nieves' alleged inconsistent testimonies: malicious prosecution?*

Plaintiff alleges that Mark Nieves fabricated a case against him.  Plaintiff further alleges that

24

Nieves should have been properly supervised for Nieves' misconduct. All of these allegations should have been brought before the PSBCA, as these claims are now barred for the *Opinion of the Board* of September 14, 2010 is res judicata. "**Under federal law, 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or *could have been raised in that action*.**'" (Emphasis supplied). *Allen v. McMurray*, 449 U.S. at 94.

However, any claim based on negligent supervision of any government employee should have been litigated before the PSBCA, as the claim stems from the same set of facts regarding the termination of Contract HCR 00667. Since the *Opinion of the Board* of September 14, 2010 is now res judicata, plaintiff is barred from resurrecting collateral issues with the sole purpose of seeking, for the third time, a remedy that has already been denied.

Lastly, as stated by the PSBCA in its *Opinion of the Board* of September 14, 2010, page 10, Fn.8:

> Appellant makes much of inconsistencies in Mr. Nieves' testimony to urge the Board not to believe him. Appellant argues that Mr. Nieves fabricated the story about Appellant stealing mail because of his animosity towards Appellant. However, Mr. Nieves' motivation in reporting alleged mail theft by Appellant is irrelevant to a decision in this matter. Likewise, whether he was completely truthful when he reported that he had seen Appellant take mail and on at least one occasion open the mail is irrelevant. **The results of the Inspection Service investigation are what matter, not what prompted the investigation**. (Emphasis supplied).

*See* Docket No. 77-12, page10.

The Court agrees with the analysis made by the PSBCA. Furthermore, plaintiff's record is devoid of evidence that shows the contrary. Plaintiff's arguments and allegations are bald and generally conclusory, not to mention self-serving. The record does have allegations which are based

on hearsay.  Specifically, plaintiff is claiming that Nieves' inconsistencies in the testimony offered during his depositions, create a genuine issue of material fact, by creating a conflict and avoid the granting of a summary judgment.  The issue before the Court is not whether Nieves acted wrongfully by mishandling or tampering with plaintiff's mail.   The issue before the Court is whether plaintiff  Ríos was rightfully terminated by default for failure to comply with the terms and conditions of Contract HCR 00667.  Unfortunately, these facts have already been decided by the PSBCA after two days of hearings, and the conclusion is that, regardless of plaintiff's co-workers' conduct, the fact remains that plaintiff was found with his hands and pants stained with the blue florescent powder.   The Court finds that plaintiff failed to present any evidence then before the PSBCA, nor now before this Court, to show that he did not have blue florescent powder in his hands and pants, nor that he was not in possession of the $5.00 bill tester.  There is just no evidence in the record that shows otherwise.

### Conclusion

For the reasons set forth above, the *Motion for Summary Judgment*, Docket No. 76, is GRANTED, and this case is dismissed with prejudice.  This *Opinion and Order* vacates the bench trial set for February 21, 2012 at 9:00 a.m.

Defendant is granted 48 hours from the entry of this order to provide an official translation of the excerpts of plaintiff's testimony, in compliance with Local Rule 5(g) of the United States District Court for the District of Puerto Rico.  *See Rodríguez v. Municipality of San Juan*, 659 F.3d 168, 174-175 (1st Cir.2011); *see also In re Alvarado*, ___ B.R. ___, 2011 WL 4527329 (D.P.R. (September 30, 2011)).

The Court will proceed to amend this *Opinion and Order* to include the certified English translations.[4]  Judgment will be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 20th day of February, 2012.

s/Daniel R. Domínguez
DANIEL R. DOMINGUEZ
United States District Judge
U.S. DISTRICT JUDGE

---

[4]        The Court proceeds allowing the Spanish language to be substituted by certified English translations only because trial is set for February 21, 2012.

27